**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DARLENE SHEILS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 CV 2766 |
| | ) | |
| v. | ) | Judge Shah |
| | ) | |
| GATEHOUSE MEDIA, INC., | ) | Jury Trial Demanded |
| GATEHOUSE MEDIA SUBURBAN | ) | |
| NEWSPAPERS, INC., and SHAW | ) | |
| SUBURBAN MEDIA GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT AND FULL RELIEF**

Plaintiff, Darlene Sheils, by her attorneys, Pedersen & Weinstein LLP, respectfully submits this motion for entry of judgment and asks that she be awarded full relief on her claims, including back pay, prejudgment interest, liquidated damages, statutory penalties, reinstatement or front pay, award for adverse tax consequences, emotional distress damages, punitive damages, attorneys' fees and costs.

**I.      Introduction**

On March 27, 2015, a jury returned a verdict on liability in Plaintiff's favor on the following four (4) claims: (a) Plaintiff's claim of FMLA retaliation with respect to her demotion (Claim 2); (b) Plaintiff's claim of FMLA retaliation with respect to her discharge (Claim 3); (c) Plaintiff's claim for unpaid overtime (Claim 4); and (d) Plaintiff's claim of retaliatory discharge under Illinois law (Claim 5).[1] The jury also found in Plaintiff's favor on the issue of joint employer liability, finding that Gate House Media, Inc. was a joint employer of Plaintiff with

---

[1] The jury found in favor of Defendants on one claim, Plaintiff's FMLA interference claim (Claim 1).

GateHouse Media Suburban Newspapers, Inc.

Following the liability phase of trial, the parties presented evidence on Plaintiff's damages and on March 30, 2015, the jury returned a verdict awarding Plaintiff the following:

Claim 2 - Back pay (FMLA demotion): $3,637
Claims 3 and 5 - Back pay (FMLA discharge, retaliatory discharge): $62,036.01
Claim 5 - Emotional distress damages: $60,000
Claim 5 - Punitive damages: $125,000

Additionally, the jury concluded that Defendants' violation of the Fair Labor Standards Act ("FLSA") was willful, and for 2010 found that Plaintiff worked 37.5 hours of overtime.

Plaintiff now moves the Court to enter judgment awarding Plaintiff the full amount of her back pay, emotional distress damages and punitive damages as determined by the jury, as well as prejudgment interest, liquidated damages under the FMLA and FLSA, the statutory penalty for unpaid wages under the Illinois Minimum Wage Law, an award for the adverse tax consequences on her back pay, plus attorneys' fees as determined by Federal Rule of Civil Procedure 54(d)(2) and Local Rule 54.3 and costs as determined by Federal Rule 54(d)(1) and Local Rule 54.1.

**II.     FMLA And Retaliatory Discharge Claims -- Back Pay And Prejudgment Interest**

Under the FMLA, Defendants are liable for damages equal to "(i) the amount of [] any wages, salary, employment benefits, or other compensation denied or lost…; (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii)…" 29 USCS § 2617(1)(A)(i)-(iii). Back pay is also a well-established remedy for a retaliatory discharge claim under Illinois law. *See, e.g. Reinneck v. Taco Bell Corp.,* 297 Ill. App. 3d 211 (Ill. App. Ct. 5th Dist. 1998)(awarding $370,000 back pay and future pay).

**Back Pay.**  As this Court held in its March 11, 2015 Order, back pay under the FMLA is an issue to be decided by the jury. (Doc. 88)(citing *Frizzell v. S.W. Motor Freight,* 154 F.3d 641,

642-644 (6th Cir. 1998).  Likewise, back pay is a jury issue under Illinois retaliatory discharge law.  (Doc. 88)(citing *Holland v. Schwan's Home Serv.,Inc.*, 2013 Il App (5th) 110560 ¶207 (5th Dist. 2012); *Kritzen v. Flender Corp.*, 226 Ill. App. 3d (2d Dist. 1992)).  After finding in favor of Plaintiff on her FMLA retaliation and Illinois retaliatory discharge claims (Claims 2, 3 and 5), the jury awarded Plaintiff back pay in the total amount of $65,673.01 ($3,637 for the demotion in Claim 2 + $62,036.01 for the termination in Claims 3 and 5).  Accordingly, Plaintiff should be awarded back pay in the amount of $65,673.01.

**Prejudgment Interest.**  Pursuant to 29 USCS § 2617(1)(A)(ii), Plaintiff seeks interest on the back pay award, which is also presumed to be appropriate under the FMLA. *See U.S. v. Bd. of Educ. of Consol. High Sch. Dist. 230, Palos Hills, Ill*., 983 F.2d 790, 799 (7th Cir. 1993)(Prejudgment interest is "presumptively available" because "[w]ithout it, compensation is incomplete and the defendant has an incentive to delay.") Because prejudgment interest is an element of complete compensation, "compound prejudgment interest is the norm in federal litigation." *Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys. Inc.*, 325 F.3d 924, 937-38 (7th Cir. 2003); *see also Gorenstein Enters., Inc. v. Quality Care U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989)(compound, rather than simple, interest is proper).

Further, back pay interest should be calculated by compounding monthly the prime rate set by the Federal Reserve during the month in which interest is sought. *See Ryl-Kuchar v. Care Centers, Inc.*, 564 F. Supp. 2d 817, 829 (N.D. Ill. 2008) *aff'd*, 565 F.3d 1027 (7th Cir. 2009) (basing calculations on the monthly prime rate set by the Federal Reserve during months for which plaintiff seeks interest was acceptable); *see also Rasic v. City of Northlake*, 2010 U.S. Dist. LEXIS 86815 at * 35 (N.D. Ill. Aug. 24, 2010)(Schenkier, Mag.)("we agree with plaintiff that the compounding should be done on a monthly, and not an annual, basis").  In *Rasic,* the

court explained that where a claim is made for ongoing lost wages, prior to judgment, the amount of lost wages increases with every missed pay check. In that situation, the court held compounding interest on a monthly basis is a more accurate way to fully compensate a plaintiff for the time value of an increasing amount of lost wages. *Id.* at *36.

As the courts in *Ryl-Kuchar* and *Rasic* held, prejudgment interest in this case should be compounded monthly at the prevailing prime rate starting on February 17, 2011 (the day Defendants fired Plaintiff) and continuing through the date judgment is entered against Defendants. Because the Court has not yet entered judgment in this case, Plaintiff is submitting a spreadsheet detailing her calculation of prejudgment interest through April 17, 2015 (see Exhibit A, attached), which is $9,509.72.[2] Plaintiff will supplement this calculation as appropriate once judgment is entered. Plaintiff also seeks post-judgment interest, for which Defendants are also liable following the entry of judgment, as provided by 28 U.S.C. § 1961. *Alcazar-Anselmo v. City of Chicago,* 2011 U.S. Dist. LEXIS 82291 at *15 (N.D. Ill. July 27, 2011). Post-judgment interest is calculated as described in the statute.

### III.    FMLA And FLSA Claims - Liquidated Damages

Plaintiff seeks liquidated damages under the FMLA and FLSA. The liquidated damages provisions of the FMLA and FLSA are identical and courts treat the case law under the statutes interchangeably. *Ulit v. Advocate S. Suburban Hosp.*, 2009 U.S. Dist. LEXIS 118587 at *3 fn 1 (N.D. Ill. Dec. 21, 2009)(Dow, J.). Accordingly, Plaintiff addresses liquidated damages under

---

[2] Plaintiff calculated prejudgment interest at the prevailing prime rate of 3.25%. *See First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999) ("Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in 'refined rate-setting' directed at determining a more accurate market rate for interest."); www.federalreserve.gov/releases/h15 (prime rate from February 17, 2011 until the present is 3.25%).

4

both statutes in this section.

## A. Legal Standard

The FMLA provides that an employer who violates the FMLA *shall* be liable not only for lost wages and interest, but also for "liquidated damages equal to the sum of the amount" of lost wages plus interest. 29 U.S.C. § 2617(a)(1)(A)(iii)(emphasis added). Likewise, under the FLSA, liquidated damages are mandatory unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law. 29 U.S.C. § 260; *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 733 (7th Cir. 1998).

Under both statutes, an employer may avoid liquidated damages only if it proves that the discriminatory actions were taken in good faith, and that it had reasonable grounds for believing that the actions did not violate the FLSA or FMLA. *Id.* (FLSA); *Ryl-Kuchar*, 564 F. Supp.2d at 829 (FMLA). This "good faith defense" is narrowly construed, *Castro v. Chicago Housing Authority*, 360 F.3d 721, 730 (7th Cir. 2004), and places upon an employer a "substantial burden in showing that it acted reasonably and in good faith." *Bankston v. Illinois,* 60 F.3d 1249, 1254 (7th Cir. 1995). Defendants cannot meet this substantial burden for two key reasons: (1) the jury's findings that they acted willfully precludes a finding of good faith; and (2) at trial, Defendants failed to prove good faith. As such, liquidated damages should be awarded.

## B. The Jury's Findings Of Willfulness Preclude Findings Of Good Faith

At trial, the jury was required to determine if Defendants' violations of the FMLA and FLSA were willful because if Defendants' conduct was not willful, certain aspects of Plaintiff's claims would have been barred by the statute of limitations. More specifically, for the FMLA claim, the Court explained in its March 11, 2015 Order that Plaintiff's claims based on her demotion would be time-barred unless the alleged violations were willful, thereby extending the

statute of limitations from two to three years. Accordingly, the Court instructed the jury that willfulness was an essential element of Plaintiff's cause of action and held that with this instruction, a general verdict could be returned on those claims without a need for a separate special interrogatory on willfulness. See *Jury Instructions*, Doc. 100, p. 20; March 11, 2015 Order, Doc. 88, p. 1. Ultimately the jury found in Plaintiff's favor on her FMLA-Retaliation-Demotion claim, meaning the jury found that Defendants' violation of the FMLA was willful.

Similarly, with respect to Plaintiff's FLSA claim, the Court held that where willfulness affects the applicable statute of limitations as it did in this case, the inquiry is to be resolved by the jury. March 11, 2015 Order, Doc. 88, p. 2 (citing *Bankston*, 60 F.3d at 1253). Accordingly, during the damages portion of the trial, the jury was required to determine whether Defendants' violation of the FLSA was willful and the jury returned a verdict concluding that it was.

With jury findings of willfulness on both of these claims, Plaintiff respectfully submits that the Court is precluded from finding that Defendants acted in good faith when it decides the liquidated damages question. *See, e.g. Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1166 (11th Cir. 2008) (holding that where jury makes a finding of willfulness for purposes of deciding the applicable statutes of limitations, the court cannot later find the employer acted in good faith in deciding liquidated damages). While Plaintiff was unable to find a Seventh Circuit case on this issue, the majority of circuits have reached the same conclusion as the Eleventh Circuit reached in *Alvarez Perez. See Singer v. City of Waco, Tex.,* 324 F.3d 813, 823 (5th Cir. 2003) (affirming liquidated damages where jury found violation of the FLSA was willful, because defendant could not show it had acted in good faith); *Chao v. A-One Med. Servs., Inc.,* 346 F.3d 908, 920 (9th Cir. 2003) (affirming liquidated damages under FLSA where there was a finding of willfulness, and noting that "a finding of good faith is plainly inconsistent

6

with a finding of willfulness"); *Herman v. PaloGroup Foster Home, Inc.,* 183 F.3d 468, 474 (6th Cir. 1999) (affirming liquidated damages for violations of the FLSA because "a finding of willfulness is dispositive of the liquidated-damages issue"); *Pollis v. New Sch. for Soc. Research,* 132 F.3d 115, 120 (2d Cir. 1997) (finding in an EPA case that employer acted willfully for purposes of the statute of limitations, "and the resulting compensatory award should be doubled pursuant to the Fair Labor Standards Act's liquidated damages provision" under 29 U.S.C. § 260); *Brinkman v. Dep't of Corr.,* 21 F.3d 370, 372 (10th Cir. 1994) (determining that district court "properly awarded liquidated damages based upon the jury's finding of willfulness" because "when fact issues central to a claim are decided by a jury upon evidence that would justify its conclusion, the Seventh Amendment right to a jury trial prohibits the district court from reaching a contrary conclusion"). Here, the jury's findings of willfulness preclude a finding of good faith and on this basis alone, Plaintiff should be awarded liquidated damages.

### C. Defendants Cannot Establish That They Acted In Good Faith

Even if liquidated damages were not mandated by the findings of willfulness, Defendants cannot meet the substantial burden necessary to show their violations were in good faith.

#### 1. FMLA Claims

On Plaintiff's FMLA claims, Defendants cannot establish that they acted in good faith and reasonably believed that their conduct was consistent with the law. The evidence in this regard with respect to Plaintiff's demotion and pay cut (Claim 2) includes the following:

- Defendants knew that the FMLA provided job protection to employees on approved FMLA leave, yet they failed to return Plaintiff to her position or an equivalent position after her FMLA leaves in 2009 and 2010.

- The suspicious timing of the adverse actions against Plaintiff -- more specifically, after years of performing well for Defendants, and on the heels of Plaintiff requesting and taking FMLA leaves, Defendants demoted her and cut her pay.

- Defendants attempted to justify demoting Plaintiff and cutting her pay from $48,000 per year

7

- to $20 per hour by claiming she was no longer a supervisor, but as she and Maggie Grover testified, and as the job descriptions for Plaintiff before and after the demotion showed, nothing about Plaintiff's job actually changed. She was doing the same job but for less pay.

- Defendants claimed at trial that everyone in Plaintiff's department had their hours cut from 40 hours per week to 37.5 to create the appearance that everyone was negatively impacted at the same time Plaintiff was demoted. Contrary to Defendants' claim, however, Sue Krish, who had never taken FMLA leave and who ultimately got one of the jobs for which Plaintiff applied, testified that her hours were not cut and she continued to work 40 hours per week.

- Even if other employees in Plaintiff's department had a slight reduction in their hours and pay, the evidence showed that Plaintiff's pay was cut twice as much as anyone else in the department (none of whom had taken FMLA leave) with no credible justification.

- Carol Gilbert, Plaintiff's direct supervisor and one of the decision makers on the demotion, made repeated negative comments to Plaintiff about taking FMLA leave before each leave preceding her demotion. Gilbert was worried about deadlines and questioned how all of the work would get done when Plaintiff was out for her surgeries.

- Similarly, Maggie Grover testified that in 2009 when Plaintiff needed surgery in the middle of a very busy time at the paper, Gilbert was annoyed that Plaintiff had to take time off, asked Plaintiff if she had to be gone so long and if she could come back earlier.

- On another occasion, Maggie Grover heard Gilbert question Plaintiff about a medical appointment saying, "Does it have to be now" and "can't you get another appointment?"

- Maggie Grover also testified that several other times she heard Gilbert question Plaintiff about her need to take time off at all and about the length of the leave.

- Additionally, Maggie Grover testified that Gilbert said she thought that Plaintiff was overblowing the pain and indicated that she did not think it was as bad as Plaintiff was making it out to be.

- Maggie Grover further testified that during a conversation about assigning work to other employees in Plaintiff's absence, Gilbert said that Plaintiff's FMLA leave "should not take that long" and appeared unhappy.

- After Plaintiff's surgeries and FMLA leaves, Gilbert began ignoring and distancing herself from Plaintiff. Gilbert told Plaintiff not to sit in her office anymore even when they discussed work, yet Plaintiff still saw other employees sitting and talking with Gilbert – the new "rule" about not sitting in Gilbert's office only applied to Plaintiff.

As for Plaintiff's termination, in addition to the evidence summarized above which includes Defendants' knowledge of the law, the repeated negative comments to and about Plaintiff taking FMLA leaves and the false explanations for demoting her and cutting her pay,

8

Defendants cannot establish that they acted in good faith and reasonably believed that their conduct was consistent with the law in light of the following evidence:

- Defendants' Vice President of Human Resources testified that it would violate the FMLA to use an employee's FMLA leave as a negative factor in making an employment decision, yet Gilbert admitted that this was exactly what she did. Specifically, when Gilbert ranked Plaintiff's attendance, which was part of a chart that Defendants relied on heavily when deciding to fire Plaintiff, she took into consideration Plaintiff's FMLA time.

- Further, in unlawfully taking Plaintiff's FMLA leave into account, Gilbert ranked Plaintiff the lowest of any other employee in the department on attendance.

- Moreover, in looking at the total number of hours that employees took off before Gilbert did her rankings (specifically from Plaintiff's return from her second FMLA leave until the time Gilbert did her rankings), Plaintiff actually had fewer hours off than all but two other employees (1 of whom had the same number of hours off and 1 who appeared to have no time off at all, including holidays). However, Gilbert still rated Plaintiff a 2 (the lowest of any other employee in the department) and rated everyone else (including those with the same or more time off than Plaintiff) a 4 or 5.

- Gilbert's unlawful consideration of Plaintiff's FMLA leave adversely affected the other areas Gilbert ranked Plaintiff on for purposes of deciding who to retain following the department's reorganization. Despite Gilbert's equivocation and attempt at trial to distinguish "hypothetical criteria and rankings" from the actual criteria and rankings used to fire Plaintiff, Gilbert clearly testified at her deposition that attendance, in her view, would affect 6 additional criteria she ranked employees on, including Plaintiff.

- Had these 7 rankings, all of which Gilbert admitted were her own subjective opinions, not been affected by her unlawfully taking into account Plaintiff's FMLA leaves, Plaintiff would have scored as high as Sue Krish and Lynn Adamo who got the jobs instead of Plaintiff.

- Defendants argued that Gilbert considered a greater period of time than was reflected on the summary chart used at trial, but even if she went back further to some undefined time, it would not have changed anything because Gilbert admitted that she still would have taken into account Plaintiff's other FMLA leaves, which again, is illegal.

- Defendants claimed they hired the most qualified people following the reorganization (none of whom had taken FMLA leave), yet they gave one of the jobs Plaintiff applied for (that of senior production coordinator), a job that required attention to detail, to the candidate with an obvious typo on her resume and who wrote on her application that she needed training on 30% of the essential job functions for the position.

- Defendants claimed that Plaintiff did not get the other position she applied for (ad traffic coordinator) because there was only one such position and it went to Sue Krish, yet at the same time Defendants ran an advertisement seeking candidates for the exact same job.

- Thereafter, within two months after telling Plaintiff that there were no ad traffic coordinator positions for her, Defendants hired two more people for the job, including an outside applicant. Within a year, Defendants hired 6 more ad traffic coordinators.

- Defendants repeatedly claimed at trial that all graphic design work (Plaintiff's work) was outsourced to India, that there was no graphic design work left here, and that no one working for Defendants built ads anymore. Yet, as recently as two weeks before trial, Defendants were recruiting for ad traffic coordinators / graphic artists with a job description stating, "the position also creates ads," and sought applicants with experience in graphic design.

- Caroll Stacklin (publisher and another decision-maker) and Gilbert both admit they knew Plaintiff wanted the job of ad traffic coordinator, yet when ad traffic coordinator jobs became available – even within a matter of a month or two of Plaintiff applying for it, neither contacted Plaintiff or hired her, despite her 17-year tenure with the company and the fact that Plaintiff had never withdrawn her application.

- In the midst of deciding who to hire and who to fire during the restructuring, Stacklin was making inquiries about Plaintiff's FMLA claim, corresponding with Hana Zach, who functioned as the local human resources representative, and Laura Williams, the Vice President of Human Resources.

- Defendants tried to explain Stacklin's email communications about Plaintiff's FMLA leave as "due diligence" it conducted with respect to the restructuring. However, this explanation was not credible and instead appeared to be a cover up for Defendants trying to fire an employee they viewed as a problem. The evidence that there was no true due diligence includes the following: Stacklin never mentioned "due diligence" in her deposition when asked about her email communications regarding Plaintiff; there was no documentation about how the termination decisions were made, something that typically would be included in any due diligence; Defendants conducted no interviews of applicants as part of the selection process; and Defendants had no notes of any conversations among the decision-makers or on how decisions were made. Instead, Defendants had only Gilbert's ranking chart – and if there had truly been any due diligence by human resources, upper management or counsel, Defendants would have looked at the chart and seen the obvious disparity in the attendance ranking Gilbert gave Plaintiff as compared to the ranking given to every other employee in the department – none of whom had ever taken FMLA leave.

- Gilbert changed her testimony on one of the key issues in this case – which was what she knew when she prepared the ranking chart (which as described above was unlawful) used by Defendants to fire Plaintiff. At trial, Gilbert claimed that her ranking chart was not part of the decision-making process to make it appear as though she ranked Plaintiff without knowing the reason she was asked to do so. Gilbert was impeached with her deposition testimony, in which she plainly testified, "[the chart] actually was the first thing that I was ever asked to do after I found out we were going to outsource." At trial, Gilbert admitted that she was changing her testimony. This was a critical issue because the chart -- which was unlawful under the FMLA because Plaintiff was ranked poorly on account of her FMLA

leaves -- was the basis for firing Plaintiff. It is axiomatic that Defendants cannot prove good faith when one of the decision-makers lied under oath about the very decision at issue.

- Other witnesses lacked credibility at trial. Stacklin, one of the other decision makers, testified about how dire the economic situation was at the company and the drastic measures that needed to be taken both with respect to Plaintiff's demotion and termination. Yet, Stacklin admitted under cross examination that for at least two straight years during this "financial crisis," she got a bonus of $40,000 per year in addition to her six figure salary.

- Similarly, Stacklin also testified how "ridiculously hard" it was to lay people off, yet when she could have rehired one of those very same employees (as proven by Defendants' continued efforts to recruit ad traffic coordinators), Stacklin did not reach out to Plaintiff, who she knew had just applied for the job, wanted the job, met all of the requirements of the job and had been a dedicated employee for seventeen years. Instead, Stacklin hired seven people from outside the company.

- After Plaintiff's superiors (Stacklin, Gilbert and Don Stamper) testified that Plaintiff was a good employee, who they liked working with, who was never disciplined, who was never written up, was dedicated to her job, who took pride in her work, who had good communication skills and who was never in jeopardy of losing her job over any performance issue, Defendants chose to call two current employees of another Defendant, Shaw Media, to testify that Plaintiff was a bad employee who no one wanted to work with, who yelled at people and made people cry. Defendants' attempt to muddy Plaintiff up in front of the jury knowing that they never claimed Plaintiff was demoted or fired for any of these reasons is further evidence that they did not act in good faith.

In sum, Defendants presented no credible evidence at trial to show they acted in good faith and reasonably believed that their conduct was consistent with the law. Instead, the evidence showed that Defendants knew their conduct was unlawful and simply tried to cover it up at the time Plaintiff was demoted and fired, and continued trying to cover it up at trial. As such, Plaintiff should be awarded liquidated damages in the amount of $75,182.73 ($65,673.01 back pay + 9,509.72 prejudgment interest).

### 2. FLSA Claim

With respect to the jury's verdict that Defendants violated the FLSA by failing to pay Plaintiff overtime wages, Defendants cannot establish that they had reasonable grounds for believing that their actions did not violate the FLSA, as supported by the following evidence:

11

- As Caroll Stacklin testified, all managers, including Plaintiff's direct manager, Carol Gilbert, were trained on the overtime requirements under the law. Yet, as the jury concluded, Plaintiff worked more than 40 hours a week in many weeks and was never paid overtime.

- Plaintiff testified there were many times that she worked off the clock – either by clocking out at the end of the day and going back to work or coming in early and clocking in later – and that Gilbert was aware of this because Plaintiff told Gilbert about the extra time worked.

- Gilbert yelled at Plaintiff for recording working more than 40 hours a week and required her to deduct time for lunches that Plaintiff never took.

- Gilbert repeatedly altered Plaintiff's time cards so that Plaintiff never was paid for more than 40 hours a week.

- Even Sue Krish, who handled the time cards when Gilbert was out, changed Plaintiff's time card to make it appear that Plaintiff had left work earlier than she actually had, which resulted in Plaintiff being paid exactly 40 hours and not for overtime she worked.

- For years into this litigation, Defendants denied that Plaintiff ever worked overtime without pay, yet when Gilbert was deposed, she admitted that she knew Plaintiff had worked overtime, knew Plaintiff was not paid for that overtime, and never did anything to ensure that Plaintiff was paid for it. Instead, Gilbert tried to blame Plaintiff, claiming falsely she did not report the overtime because Plaintiff asked her not to.

- Maggie Grover, a disinterested third party who reported to Gilbert at the same time Plaintiff did, testified that she witnessed Plaintiff clock out at the end of the day and go back to her desk and continue working.

- Maggie Grover also testified that overtime was not allowed at GateHouse, meaning employees could work overtime, but they would never get paid for it.

- Two years into the litigation, and after requiring Plaintiff to hire lawyers and file a case in federal court to recover money she was undisputedly owed, Defendants tried to absolve themselves of liability by paying Plaintiff $180 and claimed this was the most Plaintiff would ever be entitled to receive.

- Consistent with the testimony of Plaintiff and Maggie Grover, no one in the entire composing department was paid a single hour of overtime for the entire year of 2010. This is so despite the fact that Defendants' witnesses all testified that although overtime was discouraged, they would be paid if they worked it. Indeed, Jay Bogardus (one of the current Shaw Media employees who was called to say bad things about Plaintiff) testified that he knew of an employee who had worked overtime in 2010 and had been paid, yet the records do not support this claim. Further, Gilbert testified that given the nature of Defendants' deadline-driven business, it would be unusual if there was not overtime worked in Plaintiff's department, yet again, not a single hour of overtime was paid in 2010.

In sum, the evidence shows that Defendants plainly knew Plaintiff was entitled to

be paid overtime wages, yet they went to great lengths to deny her these wages. While Gilbert tried to blame Plaintiff for changing her own time cards and otherwise denied knowing about Plaintiff's overtime, the Court and the jury had the opportunity to observe Gilbert throughout the trial and conclude that she simply was not credible on this or many other points. Gilbert's non-credible denials do not amount to good faith and Defendants have failed to meet their burden.

As for the amount of liquidated damages, that is determined by first calculating the unpaid overtime compensation. An employer who violates the overtime provisions of the FLSA shall be liable to the employee affected in the amount of her unpaid overtime compensation and in an additional equal amount as liquidated damages. 29 USCS § 216. As noted above, the jury found Plaintiff worked 37.5 hours of overtime in 2010 and it is undisputed that Plaintiff's hourly rate was $20, meaning her overtime rate was $30 per hour ($20 x. 1.5). Accordingly, Plaintiff respectfully requests entry of judgment in the amount of $1,125 for the unpaid overtime and an additional $1,125 as liquidated damages, for a total of $2,250 on her FLSA claim. See also *Shea*, 152 F.3d at 733 (noting that there is a "strong presumption" in favor of doubling); *Bankston*, 60 F.3d at 1254. ("Doubling is the norm, not the exception").

### IV. Statutory Penalty Under The Illinois Minimum Wage Law

On Plaintiff's claim for unpaid overtime under the Illinois Minimum Wage Law ("IMWL"), and separate from recovering $1,125 in overtime pay and an equal amount for liquidated damages under the FLSA, Plaintiff is also entitled to a statutory penalty. Specifically, under the IMWL, an employee who is not paid as the statute requires is entitled to recover the amount of the underpayment, plus "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." 820 ILCS 105/12(a). As one district court observed, "It would appear that this penalty is

imposed over and above the damages, including liquidated damages, that are available under the FLSA." *Calderon v. J. Younes Constr. Llc & John Younes, LLC*, 2013 U.S. Dist. LEXIS 87817 at *23 (N.D. Ill. June 23, 2013)(Kennelly, J.) Here, as of April 30, 2015, the number of months Plaintiff remained unpaid is approximately 50. Accordingly, the statutory penalty Defendants owe Plaintiff is $1,125.00 ($1,125 x .02 x 50 months).

**V.     Reinstatement Or Front Pay**

Under the FMLA, an employer who violates the statute "shall be liable… for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). Alternatively, front pay is an equitable remedy designed to supplant reinstatement where reinstatement would be infeasible. *Breneisen v. Motorola, Inc.,* 2009 U.S. Dist. LEXIS 52360 (N.D. Ill. June 22, 2009)(citing *Franzen*, 543 F.3d at 426). Front pay is designed to place the plaintiff "in the identical financial position that he would have occupied had he been reinstated." *Avitia v. Metropolitan Club*, 49 F.3d 1219, 1231 (7th Cir. 1995). Front pay is also an appropriate remedy for Plaintiff's state law claim for retaliatory discharge. *See Hunt v. DaVita, Inc*., 2010 U.S. Dist. LEXIS 128527, *3-4 (S.D. Ill. Dec. 6, 2010)(as a matter of Illinois law a wrongfully discharged employee may recover lost back pay and front pay from her former employer for the period following the discharge until the employee either finds new employment or is reinstated)(citations omitted).

Here, Plaintiff seeks reinstatement to the position of Senior Production Coordinator, or in the alternative if reinstatement is infeasible, front pay for 3 years. Plaintiff's request for reinstatement or 3 years of front pay is reasonable in light of her qualifications, long-term history of employment with Defendants, commitment to continued employment, and established earnings. Based on the difference between Plaintiff's W-2 earnings and the W-2 earnings of the

14

Senior Production Coordinator for 2014 (Joint Exhibits 15 and 20), the amount of front pay for 3 years is $16,148.46 ($5,382.82 x 3 years). Accordingly, Plaintiff seeks reinstatement or $16,148.46 in front pay.

## VI. Award For Adverse Tax Consequences

As an additional remedy, Plaintiff also seeks $6,567.30 to offset the tax burden she will incur as a result of her lump-sum back-pay and/or front pay award, which the Seventh Circuit recently recognized as an appropriate remedy in employment discrimination cases. *EEOC v. Northern Star Hospitality, Inc.,* 777 F.3d 898, 902-904 (7th Cir. 2015)(citing *Eshelman v. Agere Sys.,* 554 F.3d 426, 441 (3d Cir. 2009) (holding that "an award to compensate a prevailing employee for her increased tax burden as a result of a lump sum award will, in the appropriate case, help to make a victim whole") and *Sears v. Atchison, Topeka & Santa Fe Ry. Co.,* 749 F.2d 1451, 1456 (10th Cir. 1984) (upholding award of tax component to back pay given a district court's "wide discretion in fashioning remedies to make victims of discrimination whole")).[3]

Here, upon Plaintiff's receipt of $65,673.01 in back pay, taxable as wages in the year received, *see Northern Star Hospitality*, 777 F.3d at 902 (*citing* IRS Pub. No. 957 (Rev. Jan. 2013), available at www.irs.gov/pub/irs-pdf/p957.pdf), Plaintiff will be bumped into a higher tax bracket.[4] The resulting tax increase, which would not have occurred had she received the pay on

---

[3] While the Seventh Circuit found an award to offset higher taxes appropriate in a Title VII case, such an award is also appropriate under the FMLA, which similarly provides for equitable relief. 29 U.S.C. § 2617(a)(1)(B); *see also Powell v. N. Ark. College,* 2009 U.S. Dist. LEXIS 59826 (W.D. Ark. July 1, 2009)(in FMLA case finding "the Court is of the opinion that if the back pay awarded by the jury will push [plaintiff] into a higher tax bracket than she would have been in had the monies been timely paid, in equity the [defendant] should be required to cover that expense as part of making [plaintiff] whole." *Powell v. N. Ark. College,* 2009 U.S. Dist. LEXIS 59826 at *7 (W.D. Ark. July 1, 2009).

[4] Plaintiff's W-2 for 2014 reflects wages of $35,665.40. (Joint Exhibit 15) If Plaintiff's wages remain consistent in 2015, which is probable given that she remains employed by the same company, her tax bracket would be 15%, but adding the back pay award of $65,673.01 would

a regular, scheduled basis as she should have, will then decrease the total award she will receive. As the Seventh Circuit explained, without the tax-component award, Plaintiff will not be made whole. *Northern Star Hospitality*, 777 F.3d at 902. Accordingly, Plaintiff should be awarded $6,567.30 to offset the additional tax burden.

## VII. Attorneys' Fees And Costs

In addition to the damages set forth above, Plaintiff seeks attorneys' fees and costs for prevailing on her overtime and FMLA claims. With respect to the FMLA claims, the statute provides: "The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3). As the Seventh Circuit has explained, "[u]nlike most other statutory fee-shifting provisions, section 2617 *requires* an award of attorneys' fees to the plaintiff when applicable. The award is not left to the discretion of the district court." *Franzen v. Ellis Corp.,* 543 F.3d 420, 430 (7th Cir. 2008)(emphasis in original)(citations omitted). In this way, the fee-shifting provision under the FMLA is more favorable toward prevailing plaintiffs than many other statutory fee-shifting provisions. *Id.* (citing *McDonnell v. Miller Oil Co., Inc.,* 968 F. Supp. 288, 293 (E.D. Va. 1997)).

Plaintiff also seeks attorneys' fees and costs for prevailing on her overtime claims. The FLSA directs courts to award reasonable attorneys' fees and costs to prevailing parties. See 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 550 (7th Cir. 1999).

---

bump her to the next highest tax bracket of 25%. (see Rev. Proc. 2014-61 available at www.irs.gov/pub/irs-drop/rp-14-61.pdf). Accordingly, Plaintiff calculated the tax component by multiplying the back pay award by the 10% increase in taxes.

Similarly, the IMWL states that a prevailing party "may recover * * * costs and such reasonable attorney's fees as may be allowed by the Court." 820 ILCS 105/12(a).

Accordingly, Plaintiff respectfully requests reasonable attorneys' fees and costs, which will be detailed in separately filed motions pursuant to Federal Rule of Civil Procedure 54(d) and Local Rules 54.1 and 54.3

## VIII. Conclusion

Based on the foregoing, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor and award Plaintiff the following relief consistent with the jury's verdict and case law: back pay in the amount of $65,673.01; prejudgment interest in the amount of $9,509.72; unpaid overtime compensation in the amount of $1,125; liquidated damages in the amount of $76,307.73 ($65,673.01 + $9,509.72 + $1,125); statutory penalty under the IMWL in the amount of $1,125; emotional distress damages in the amount of $60,000; punitive damages in the amount of $125,000; reinstatement or front pay in the amount of $16,148.46; and $6,567.30 to offset the additional taxes she will owe as a result of the back pay award. Plaintiff also respectfully requests attorneys' fees as determined by Federal Rule of Civil Procedure 54(d)(2) and Local Rule 54.3 and costs as determined by Federal Rule of Civil Procedure 54(d)(1) and Local Rule 54.1.

Dated: April 29, 2015                                          Respectfully submitted,

                                                                    By:    */s/Jill Weinstein*

PEDERSEN & WEINSTEIN LLP
55 E. Jackson Blvd., Suite 510
Chicago, Illinois 60604
(312) 322-0710
(312) 322-0717 (facsimile)

## CERTIFICATE OF SERVICE

   I hereby certify that on April 29, 2015 a copy of the foregoing *Plaintiff's Motion for Entry of Judgment and Full Relief* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic case filing system. Parties may access this filing through the Court's system.


Mr. Michael A. Paull
Mr. Brian S. Schwartz
Klein Dub & Holleb
660 La Salle Place, Suite 100
Highland Park, IL 60035
map@labor-law.com
brian.schwartz@labor-law.com


                /s/Jill Weinstein
                Jill Weinstein



Erika Pedersen
Jill Weinstein
**PEDERSEN & WEINSTEIN LLP**
55 E. Jackson, Suite 510
Chicago, IL 60604
(312) 322-0710
(312) 322-0717 (facsimile)