**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DARLENE SHEILS,

        Plaintiff,

    v.

GATEHOUSE MEDIA, INC., GATEHOUSE
MEDIA SUBURBAN NEWSPAPERS, INC.
and SHAW SUBURBAN MEDIA GROUP,
INC.,

        Defendants.

No. 12 CV 2766

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

The jury returned a verdict in favor of defendants GateHouse Media, Inc., and GateHouse Media Suburban Newspapers, Inc., on plaintiff Darlene Sheils's Family Medical Leave Act interference claim and in favor of Sheils on her claims for FMLA retaliation (based on a demotion), FMLA retaliation (based on her subsequent firing), Illinois retaliatory discharge, and overtime (under the Fair Labor Standards Act and Illinois Minimum Wage Law). The jury also found that GateHouse Media, Inc., and GateHouse Media Suburban Newspapers, Inc., were joint employers. The jury awarded Sheils: $3,637 in back pay for FMLA retaliation-demotion, $62,036.01 in back pay for FMLA and Illinois retaliatory discharge, $60,000 for emotional distress for retaliatory discharge, and $125,000 in punitive damages for retaliatory discharge. The jury also found that GateHouse's violation of the Fair Labor Standards Act was willful and that Sheils worked 37.5 hours of unpaid overtime in 2010.

GateHouse now moves for judgment as a matter of law on all of Sheils's claims or, in the alternative, for a new trial or reduction of damages through remittitur. Sheils moves for entry of judgment and full relief and moves for entry of judgment against Shaw Suburban Media Group, Inc., under successor liability. For the following reasons, GateHouse's motion for judgment as a matter of law is denied, GateHouse's motion for a new trial is granted in part, denied in part, and Sheils's motion for entry of judgment and full relief is granted in part, denied in part. Sheils's request for a finding of successor liability as to Shaw is granted. The entry of judgment must await the resolution of all claims.

## I.     Motion for Judgment as a Matter of Law or New Trial

GateHouse moves for judgment as a matter of law on all of Sheils's claims, arguing that there was insufficient evidence to support a jury finding in favor of Sheils. In the alternative, GateHouse moves for a new trial or remittitur of damages.

### A.     Background

Darlene Sheils worked as graphic designer in creative design work for local suburban newspapers published by GateHouse Media Suburban Newspapers, Inc. She developed carpal tunnel syndrome and filed a workers' compensation claim in June 2009. Sheils took two FMLA leaves for surgery. Her first FMLA leave was during August to September 2009 and December 2009 to January 2010. During her FMLA leave, the company started downsizing. Upon returning from leave in January 2010, Sheils was reclassified from a salaried employee with the title of creative director to an hourly employee with reduced pay. Then, while out on a

second FMLA leave in January 2011, she was fired. Her position was outsourced to India. Other positions, such as Ad Traffic Coordinator and Senior Production Coordinator, remained at GateHouse. Sheils applied for these two positions but did not get them.

GateHouse Media Suburban Newspapers, Inc., was a subsidiary of GateHouse Media, Inc. In October 2012, Shaw Suburban Media Group, Inc., bought GateHouse Suburban in an asset purchase, with all proceeds retained by GateHouse Media. GateHouse Media is currently an operating business supporting subsidiary newspaper companies.

Sheils filed two claims under the FMLA based on her demotion after returning from her first FMLA leave: an FMLA interference claim and an FMLA retaliation claim. She also pursued claims for retaliation under the FMLA and Illinois common law based on her discharge. Finally, she alleged that she worked overtime for which she was not compensated in violation of the Fair Labor Standards Act and Illinois Minimum Wage Law.

### A. Legal Standards

On a motion for judgment as a matter of law under Fed. R. Civ. P. 50, "the question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). A court must determine whether the evidence presented at trial, when viewed in the light most favorable to the non-moving party, is sufficient to support the verdict. *Id.* A "mere scintilla" of evidence is not sufficient to sustain a

3

verdict, *id.*, but judges are not to substitute their view of the contested evidence in place of the jury's determination. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) ("We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury."). In other words, the test is whether "no rational juror could have found for the prevailing party." *Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002).

Under Rule 59, a new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014) (citing *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012)). "A new trial based on inconsistent verdicts is warranted only when a jury's verdict cannot be reconciled with the evidence at trial." *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010) (citing *Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006)). "Any plausible explanation for the verdict precludes reversal." *Id.* (citing *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998)). Also, "the consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." *Bates v. Jean*, 745 F.2d 1146, 1151 (7th Cir. 1984) (citing *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 118–22 (1963)).

### B.    FMLA Demotion Claims (Interference and Retaliation)

GateHouse seeks judgment as a matter of law on Sheils's FMLA interference and retaliation claims for her January 2010 demotion upon returning from her FMLA leave. GateHouse admits that some negative comments relating to Sheils's June 2009 workers' compensation claim allegedly made by GateHouse employees— including Carol Gilbert (Sheils's direct supervisor), Caroll Stacklin (GateHouse's publisher), and Don Stamper (GateHouse's production director)—were offered at trial, but believes these are irrelevant to the FMLA claims. The only other evidence, GateHouse maintains, is the timing of Sheils's demotion immediately after her FMLA leave, which GateHouse argues is insufficient by itself to establish a retaliatory motive. And GateHouse also contends that Sheils's position was eliminated during outsourcing of several positions, so she could not have been returned to her previous position. There was evidence, however, to support a jury verdict for Sheils on both claims. For the interference claim, Sheils only needed to prove that she was not reinstated to her former position and (for statute of limitations purposes) that GateHouse knew or was indifferent to violating the FMLA. For the retaliation claim, Sheils needed to prove that she was demoted in retaliation for her FMLA leave. At trial, Sheils presented evidence that she was demoted because upon returning from leave, she was reclassified from the salaried position of creative director to an hourly-rate position laying out ads. In addition to the negative comments her supervisors made relating to her workers' compensation claim (involving the same injury for which Sheils requested FMLA leave) and the timing of her demotion after returning from leave, Sheils also presented evidence

that her pay was cut more significantly than other employees who did not take leave and that her supervisor Gilbert's behavior toward Sheils changed after her FMLA leave.

GateHouse also seeks a new trial on the FMLA retaliation-demotion claim. GateHouse believes the evidence presented to the jury did not justify divergent verdicts between the FMLA interference-demotion and FMLA retaliation-demotion claims because the two claims are coextensive and required the same finding as to knowledge and intent. Sheils argues that although similar, the FMLA interference-demotion and retaliation-demotion claims are based on two separate causes of action and do not require identical findings.[1]

Jury verdicts are "inconsistent" only if there is no plausible explanation for the verdict, considered in light of the jury instructions. *Fox*, 600 F.3d at 844 (citing *Pearson*, 471 F.3d at 739); *see Deltoughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005) ("If possible, this court must reconcile apparently inconsistent verdicts, rather than overturn them.") (citing *Am. Nat'l Bank & Trust Co. of Chicago v. Reg'l Transp. Auth.,* 125 F.3d 420, 431 (7th Cir. 1997)); *Bates*, 745 F.2d at 1151 ("Of course, the consistency of the jury verdicts must be considered in light of the judge's instructions to the jury.") (citing *Gallick*, 372 U.S. at 118–22). A new trial, not judgment as a matter of law, is the appropriate remedy for inconsistent verdicts

---

[1] Sheils argues that GateHouse waived this argument by failing to make a contemporaneous objection at the time the jury rendered its verdict but acknowledges that the Seventh Circuit has never decided whether the failure to contemporaneously object constitutes a definitive waiver. *Carter*, 165 F.3d at 1079–80. Given this open question, I address the merits.

because "[t]here is no priority among inconsistent verdicts." *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994) (citing *Am. Cas. Co. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1305 (7th Cir. 1993)); *Deloughery*, 422 F.3d at 617 ("A new trial on all claims is the appropriate remedy (rather than judgment as a matter of law) in a case in which the jury has returned inconsistent verdicts.").

The FMLA interference-demotion verdict for GateHouse and the FMLA retaliation-demotion verdict for Sheils are inconsistent, requiring a new trial on both claims. Both the interference claim and retaliation claim are based on the same underlying event, Sheils's January 2010 demotion. Both claims required the jury to assess whether Sheils was reinstated to an equivalent position or demoted. The interference instruction required Sheils to prove that she was not reinstated to an equivalent position in 2010 after returning from her FMLA leave, or GateHouse to prove that it would have demoted Sheils anyway after returning from her FMLA leave. So the verdict for GateHouse on the interference claim means that the jury either found that Sheils was reinstated to an equivalent position or found that she would have been demoted regardless of her FMLA leave. In contrast, the verdict for Sheils on the retaliation claim means that the jury found that GateHouse demoted Sheils in 2010 because of her FMLA leave. Logically, under the instructions provided to the jury, Sheils could not have been reinstated to an equivalent position (or demoted regardless of her FMLA leave) while she was demoted in retaliation for her FMLA leave.

To reconcile the divergent verdicts, Sheils tries to distinguish between "a failure to reinstate to a former or equivalent position" (the materially adverse employment action required for FMLA interference) and "a demotion" (the materially adverse employment action required for FMLA retaliation). [129] at 19. Sheils asserts that the jury could have concluded that while Sheils was reinstated to an equivalent position for the interference claim, she was still "demoted" in retaliation for exercising her rights under the FMLA because it was still a lesser position in some respects. But the jury instructions precluded finding both that Sheils was reinstated to an "equivalent" position while being demoted. Specifically, the jury instruction defined an "equivalent position" as "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites, and status" and which involves "the same or substantially similar duties and responsibilities." [100] at 19. Sheils could not have been reinstated to a "virtually identical" position while being demoted. In addition, the FMLA interference-demotion jury instruction referenced both the failure to reinstate Sheils to her former position and her demotion as the same event at issue. [100] at 18. Similarly, Sheils argued in closing that both of these claims related to the demotion and pay cut and that the facts surrounding the demotion were the same for both claims.

For interference and retaliation claims premised on the same underlying conduct, "[t]he difference between a retaliation and interference theory is that the first 'requires proof of discriminatory or retaliatory intent while [an interference

theory] requires only proof that the employer denied the employee his or her entitlements under the Act.'" *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting in part *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). Sheils's interference and retaliation claims are based on the same alleged demotion and require essentially the same proof, with only a higher level of proof required for retaliation. Therefore, the verdict for Sheils on the retaliation claim, which requires more proof, is inconsistent with a verdict for GateHouse on the interference claim. *See, e.g., Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001) (where employer replaced employee supervisor positions with "team leader" positions, jury finding that plaintiff's termination was retaliatory was irreconcilable with jury finding that employer's decision not to rehire plaintiff as a "team leader" was not retaliatory).

Because the FMLA interference-demotion and retaliation-demotion verdicts were inconsistent, a new trial on both claims is necessary because "[t]here is no priority among inconsistent verdicts." *Gordon*, 29 F.3d at 298 (citing *Am. Cas. Co.*, 987 F.2d at 1305). But the jury verdicts on Sheils's other claims need not be disturbed because there is no such inconsistency among them. "Partial trials are proper if 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" *McClain v. Owens-Corning Fiberglas Corp.*, 139 F.3d 1124, 1128 (7th Cir. 1998) (quoting in part *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). In particular, Sheils's retaliatory discharge claims are based on a distinct underlying

event—Sheils's 2011 termination, not her 2010 demotion—and required different elements of proof. *See, e.g., Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 485 (7th Cir. 2000); *McClain*, 139 F.3d at 1128; *Harris*, 252 F.3d at 599.

GateHouse's motion for a new trial on liability and damages for the FMLA interference-demotion and FMLA retaliation-demotion claims is granted.

### C.    Retaliatory Discharge Claims

GateHouse moves for judgment as a matter of law or, in the alternative, a new trial on Sheils's retaliatory discharge claims under the FMLA and Illinois law for her 2011 termination. GateHouse's arguments for both judgment as a matter of law and a new trial are the same and are addressed as one.

### 1.    FMLA Retaliatory Discharge

The FMLA retaliation claim required Sheils to prove that GateHouse discharged her in 2011 because of her FMLA leave. GateHouse asserts that there was not enough evidence to support the jury's verdict in favor of Sheils. Acknowledging that evidence was introduced to show Sheils's supervisors' negative comments relating to her workers' compensation claim, GateHouse argues that this evidence is irrelevant to the FMLA claim and that the only evidence offered to show her termination was retaliatory were: the coincidental timing of department-wide layoffs, GateHouse's decision not to hire Sheils for either of the post-reorganization positions to which she applied, and GateHouse's later advertisements for these post-reorganization positions. According to GateHouse, its witnesses' testimony explaining why Sheils was not rehired and why these ads were posted was unrebutted, and therefore must be credited by the fact-finder.

10

The jury was presented with a legally sufficient amount of evidence to find that Sheils was terminated in 2011 in retaliation for exercising her rights under the FMLA. The evidence offered to show retaliation included: Sheils and a former co-worker, Maggie Grover, testified that Sheils's supervisor Gilbert made negative comments about Sheils's need for FMLA leave, the timing and length of her FMLA leaves, and how the work would get done in Sheils's absence; Sheils's supervisor testified that she took Sheils's FMLA leave into account when rating her on attendance and other categories in considering whether to terminate her; Stacklin inquired about Sheils's FMLA leave prior to Sheils's termination; GateHouse decided not to hire Sheils for either post-reorganization position to which she applied; and GateHouse advertised for these positions after Sheils was not selected. Taken together, this was "a legally sufficient amount of evidence from which [the jury] could reasonably derive its verdict" in favor of Sheils. *Massey*, 226 F.3d at 924. GateHouse argues that its witnesses provided various, uncontradicted explanations for its actions, so the jury was required to credit their testimony, but "[i]t is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony *must* be true." *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994) (emphasis in original) (citing *Masciale v. United States*, 356 U.S. 386, 388 (1958)). Under the evidence presented in this case, the jury was not required to believe the explanations proffered by GateHouse's witnesses. GateHouse's motion for judgment as a matter of law or a new trial on the FMLA retaliatory discharge claim is denied.

11

## 2. Illinois Law Retaliatory Discharge

GateHouse also seeks judgment as a matter of law and a new trial on Sheils's Illinois common law retaliatory discharge claim. This retaliation claim required Sheils to prove that her exercise of rights under the Illinois Workers' Compensation Act was a proximate cause of her discharge in 2011. GateHouse acknowledges that evidence was introduced regarding Sheils's supervisors' alleged negative comments relating to her June 2009 workers' compensation claim, which suggested that Sheils's supervisors were angry with her for filing the workers' compensation claim and implied that she should not have hired a lawyer. Even so, GateHouse points out that, on the stand, these witnesses denied making these comments. GateHouse also argues that a jury could not find proximate cause between the 2009 workers' compensation claim and her termination in 2011, eighteen months later. However, evidence was also introduced during trial to show that Sheils's FMLA leaves were related to her workers' compensation injury and that GateHouse considered Sheils's workers' compensation claim and subsequent FMLA leaves to be related. For example, evidence was introduced showing that Stacklin inquired about the status of Sheils's workers' compensation claim when Sheils was considered for termination. Taken together, this evidence was legally sufficient for a jury to find a proximate cause between Sheils's workers' compensation claim in 2009 and her discharge eighteen months later. GateHouse's motion for judgment as a matter of law or a new trial on the workers' compensation retaliatory discharge claim is denied.

12

### 3. Back Pay

GateHouse moves to overturn the jury's award of $62,036.01 in back pay for Sheils's 2011 retaliatory discharge. Back pay is an available remedy for retaliatory discharge under the FMLA and Illinois law. 29 U.S.C. § 2617(1)(A); *Kritzen v. Flender Corp.*, 226 Ill.App.3d 541, 557–58 (2d Dist. 1992). GateHouse offers several arguments for why it believes this award was not supported by the evidence.

First, GateHouse argues that the evidence showed that Sheils would not be able to perform the physical requirements of either available job with one hand upon returning from her FMLA leave. A plaintiff's inability to perform the essential functions of her job bars recovery of back pay for retaliatory discharge under both the FMLA and Illinois law. *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008); *Dale v. S. Cent. Ill. Mass Transit Dist.*, 2014 IL App (5th) 130361, ¶¶ 33–34. GateHouse believes the evidence at trial showed that Sheils could not perform either available post-reorganization job upon returning from her FMLA leave. Specifically, Stacklin (GateHouse's publisher) testified that Sheils would not be able to perform the physical requirements of either job with the use of only one hand. In turn, Sheils testified that she had been practicing typing with one hand and believed that she could perform the job requirements. GateHouse argues that Sheils's testimony was entirely speculative, because she had never seen either job performed, and was less "persuasive" than Stacklin's testimony, which was the "best evidence" because it was based on her firsthand knowledge of the job requirements. Sheils's testimony on this point was not entirely speculative, however, because Sheils presented evidence that her doctor released her to return

to work prior to expiration of her FMLA leave, that she was willing to return to work despite having a restriction on the use of her right hand, and that she knew the job duties of the two positions for which she had applied because she had been given the job descriptions as part of the application process and had performed most of those job functions during her prior employment. As evidenced by GateHouse's own arguments about the persuasiveness of Stacklin's versus Sheils's testimony, this issue was ultimately a credibility determination for the jury based on competing testimony regarding Sheils's ability to perform either job upon returning from leave. "[T]he jury [was] entitled to weigh the evidence presented to it and to evaluate the credibility of the witnesses." *Kapelanski*, 390 F.3d at 531.

Second, GateHouse asserts that introduction of its policies for ADA reasonable accommodation and light duty prejudicially confused the jury regarding whether Sheils was able to work after her FMLA leave and whether GateHouse would have terminated her anyway after her FMLA leave. GateHouse argues that these policies—on their face and as interpreted and explained by Stacklin (GateHouse's publisher) and Laura Williams (GateHouse's Vice President of Human Resources)—did not show that GateHouse would have accommodated Sheils's physical restrictions or offered her an extended leave, even if these witnesses testified that each situation is considered on a case-by-case basis. Rather, GateHouse argues that their testimony established that GateHouse would have terminated Sheils's employment at or shortly after her leave expiration because of GateHouse's policies and business conditions at the time, which would not have

allowed Sheils to return to work with restrictions on the use of one arm. GateHouse insists this testimony was more persuasive than Sheils's introduction of GateHouse's policies regarding additional leave and light duty options and more persuasive than Sheils's testimony that she could perform the post-reorganization job requirements with the use of one hand. Sheils argues that she presented evidence that GateHouse would have accommodated her short-term restriction on use of her right hand and that the introduction of GateHouse's policies was not prejudicial because the issue was not whether the FMLA legally obligated GateHouse to provide Sheils with an accommodation, but whether GateHouse would have attempted to accommodate her pursuant to their internal policies instead of terminating her for her FMLA leave.

At the end of the day, GateHouse's arguments about the persuasiveness of Stacklin and Williams's testimony about policy implementation versus the written policies themselves goes to the weight and credibility determinations entrusted to the jury. *Kapelanski*, 390 F.3d at 531. These policies were relevant to the issue of whether GateHouse would not have terminated Sheils upon the expiration of her FMLA even if she did not have the use of one hand, since it had flexible policies for accommodating employees for ADA and light-duty. Introduction of these ADA and light-duty policies was not unduly prejudicial (even in the absence of jury instructions clarifying that under the FMLA, there is no right to accommodation) because GateHouse was allowed to present witnesses to explain these policies and GateHouse's general policies regarding FMLA leave. GateHouse was also permitted

15

to (and did) argue to the jury that the FMLA did not require accommodation of an employee's illness.

Third, GateHouse concludes that the jury must have been confused because it chose to award a lesser amount of back pay damages than any of the options listed in a damages chart used by both parties during closing arguments. In turn, Sheils argues that the jury was not required to adopt the damages chart created by the parties and that the jury was instructed on how to calculate back pay—broken down by category, position, and year—so that it could determine back pay as it deemed appropriate.

Under Illinois law, "where the existence of damages is established, 'the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.'" *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1398 (7th Cir. 1997) (quoting in part *In re Busse,* 124 Ill.App.3d 433, 439 (1st Dist. 1984)). The law does not require that a jury verdict must match the damages figures provided by either party, or even a combination of the figures; "[r]ather, all the law requires is that the evidence tend to establish, with a fair degree of probability, a basis for the assessment of damages." *Id.*, (quoting *F.L. Walz, Inc. v. Hobart Corp.*, 224 Ill.App.3d 727, 733 (3d Dist. 1992)). A jury can also reduce damage calculations, even if from an expert, without invalidating the verdict. *Id.*, (citing *F.L. Walz*, 224 Ill.App.3d at 733). Here, the back pay award of $62,036.01 was less than the back pay damages suggested by the parties ($0, $75,159.58, or $101,669.70), which were based on the post-reorganization positions for which

16

Sheils applied. But the jury was instructed on how to calculate back pay, and the amount awarded is not so far off from either parties' suggestions that a court could conclude it had no basis in fact. For example, the jury could have believed that if Sheils had received the Ad Traffic Coordinator position, her salary might not perfectly match Sue Kirsch's (perhaps because Sheils would have been legitimately placed on reduced hours, additional unpaid leave, or light duty compensated at a lower rate), and therefore Sheils was not entitled to all the back pay she requested.

GateHouse also seeks remittitur. In considering a motion for remittitur, the jury's verdict must be given "proper deference." *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). In deciding whether a damages award is excessive, a court considers the following factors: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (quoting *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). Remittitur is not appropriate here. There was a sufficient basis for the award, based on the evidence presented at trial. And the award is not "monstrously excessive" but in fact is less than, but comparable to, the amount the parties expected the jury to award for back pay if they believed Sheils would have been hired for either position to which she applied.

GateHouse's motion for judgment as a matter of law, for a new trial, or remittitur on the back pay damages is denied.

### 4. Emotional Distress Damages

The jury awarded $60,000 in damages for emotional distress for Sheils's Illinois retaliatory discharge claim. GateHouse moves to strike the award, for a new trial, or for remittitur, arguing that there is no rational connection between the jury's award of $60,000 because Sheils's emotional distress was only "garden variety" since she was never diagnosed with depression or anxiety and never received mental health treatment. GateHouse also argues that Sheils's testimony about her emotional distress is not itself evidence that Sheils suffered tangible emotional distress. In turn, Sheils argues that evidence of medical or professional treatment or expert testimony is not necessary to prove emotional distress damages and that the jury's award of $60,000 is in line with decisions in similar cases.

An emotional distress damages award can be supported solely by a plaintiff's testimony about his or her emotional distress. *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001). Here, Sheils and her husband testified that Sheils experienced emotional distress after her termination, including feeling devastated, depressed, and humiliated, having difficulty socializing or enjoying former pastimes, and experienced physical symptoms including stomach spasms, difficulty sleeping, and grinding teeth. Sheils was not required to present medical or expert testimony or show that she sought medical or mental health treatment. *See Tullis*, 243 F.3d at 1068; *see also Drakeford v. Univ. of Chicago Hosps.*, 2013 IL App (1st) 111366, ¶ 61, *appeal denied*, 996 N.E.2d 11 (Ill. 2013) ("The fact that a plaintiff

testifies only briefly about an injury does not necessarily lessen the severity of the injury."). Considering the factors for determining whether an award is excessive, see *Adams*, 798 F.3d at 543, new trial or remittitur is not appropriate. Based on the evidence at trial from Sheils and her husband regarding the emotional impact of the retaliatory discharge on Sheils, the jury's award of $60,000 was perhaps generous, but not excessive. It is also in line with emotional distress damages awarded in other actions for retaliatory discharge under Illinois law.[2]

The emotional distress award will stand.

### 5.  Punitive Damages

The jury awarded $125,000 in punitive damages for Sheils's Illinois retaliatory discharge claim. GateHouse argues that this award was not based on evidence of willful and wanton conduct because GateHouse witnesses testified that Sheils was terminated in a general layoff and that there were plausible reasons for hiring others in the positions for which Sheils applied.

Under Illinois law, punitive damages may be awarded in cases of retaliatory discharge for filing a workers' compensation claim because otherwise there would be

---

[2] Although Illinois courts have traditionally declined to compare damages awarded in other cases in determining whether a particular award is excessive, *Drakeford*, 2013 IL App (1st) 111366, ¶ 62, Sheils's emotional distress damages award of $60,000 is not out of line when compared with other actions for retaliatory discharge under Illinois law. *See, e.g., Holland v. Schwan's Home Serv., Inc.*, 2013 IL App (5th) 110560, ¶¶ 218–21, *reh'g denied* (July 1, 2013), *appeal denied*, 996 N.E.2d 13 (Ill. 2013) (emotional distress award of $400,000 not excessive where plaintiff testified about his embarrassment and sense of failure, his subsequent house foreclosure for failure to make payments, his anxiety from losing his medical insurance for his son, and where his wife testified to his difficulty socializing and managing his anger); *Tullis*, 243 F.3d at 1067–69 (emotional distress award of $80,000 was "generous" but not excessive where plaintiff testified that he felt low, degraded, and back-stabbed and experienced financial difficulties providing for his family while without work for several months).

19

little deterrent preventing employers from terminating employees and paying a small fine for violating the Illinois Workers' Compensation Act. *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186 (1978). Once a court has determined as a matter of law that punitive damages can be awarded for a particular cause of action, it is for the jury to decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages. *Cirrincione v. Johnson*, 184 Ill.2d 109, 116 (1998). Punitive damages may be awarded where retaliatory discharge was "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay*, 74 Ill.2d at 186. Evidence of willfulness can include: discharging an employee for suspected laziness or malingering relating to their workers' compensation claim, *Hollowell v. Wilder Corp. of Del.*, 318 Ill.App.3d 984, 989–90 (5th Dist. 2001); failing to rehire or recall an employee, *Heldenbrand v. Roadmaster Corp.*, 277 Ill.App.3d 664, 673 (5th Dist. 1996); threats, fabricated complaints, false evaluations of job performance, and other coercive tactics, *Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 277 F.3d 936, 946–47 (7th Cir. 2002).

During trial, Sheils presented sufficient evidence from which the jury could have concluded that GateHouse discharged Sheils because it was unhappy she filed a workers' compensation claim. Sheils presented evidence at trial indicating that she was employed for several years at GateHouse with a good record prior to her termination, that her pay was cut more than other employees' pay shortly after she

filed her workers' compensation claim, that her supervisors commented that GateHouse was unhappy she filed a claim and implied that she should not have hired a lawyer, and that GateHouse failed to rehire Sheils when additional positions became available after her termination. Although Sheils did not present a compelling tale of wanton animosity, the evidence was sufficient for a jury to make the call.

The amount of punitive damages awarded was not legally excessive. "The amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption." *Blount v. Stroud*, 395 Ill.App.3d 8, 22 (1st Dist. 2009). In reviewing a jury's award of punitive damages, relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. *Deal v. Byford*, 127 Ill.2d 192, 204 (1989). Each case must be assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied. *Deal*, 127 Ill.2d at 204. GateHouse Media has an estimated worth of over $500 million.[3] An award of $125,000 (0.025% of GateHouse's net worth) is not conscience-shocking. *See, e.g., Holland v. Schwan's Home Serv., Inc.*, 2013 IL App (5th) 110560, ¶¶ 252–254 (in retaliatory discharge action, punitive damages award of $3.6 million, or 1% of defendant's net worth, was not excessive), *reh'g denied* (July 1, 2013), *appeal denied*, 996 N.E.2d 13 (Ill. 2013); *Blount*, 395 Ill.App.3d at 23 (in retaliatory

---

[3] This figure was presented in Sheils's brief ([129] at 8) and was not disputed by GateHouse.

discharge action, punitive damages award of $2.8 million, or 3% of defendant's net worth, was not excessive); *Hollowell*, 318 Ill.App.3d at 990 (in retaliatory discharge action, punitive damages award of $50,000 against defendant worth $150 million was not excessive). And the punitive damages award need not be tied to Sheils's back pay award because, under Illinois law, "there is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Blount*, 395 Ill.App.3d at 23 (citing *Deal*, 127 Ill.2d at 204).

### D. Overtime

GateHouse also seeks judgment as a matter of law or a new trial on the award of overtime pay to Sheils under the Fair Labor Standards Act and the Illinois Minimum Wage Act. The jury calculated a total of 37.5 hours in uncompensated overtime (9.5 hours from January 18 to April 15, 2010, and 28 hours from April 16, 2010, to January 18, 2011) and found that GateHouse's violation of the FLSA was willful. GateHouse argues that Sheils cannot meet her burden of proof on her FLSA overtime claim because there were no timecards in evidence showing that Sheils worked more than forty hours per week and because GateHouse's witnesses testified that the workload of the department as a whole was diminished. There was however, more than a "mere scintilla" of evidence in support of plaintiff's claim; Sheils presented evidence to show that her direct supervisor, Gilbert, made Sheils change her times or changed them herself and knew that Sheils had worked overtime without payment. The jury could sufficiently base its verdict on this

22

evidence, and the motion for a new trial or matter of law on the overtime award is denied.

### E.    Joint Employers

GateHouse moves for judgment as a matter of law or a new trial on the jury's finding that GateHouse Media and GateHouse Suburban were joint employers. The ultimate determination of whether a joint-employer relationship exists varies depending on the specific facts of each case. *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008). For a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee. *Id.* (citing *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007); 29 C.F.R. § 825.106). In assessing the amount of control an employer exercised over an employee, factors considered by courts include, but are not limited to, whether the alleged employer: (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records. *Moldenhauer*, 536 F.3d at 644.

Although Stacklin (the GateHouse publisher) was technically a GateHouse Media employee when she was involved in the decision to terminate Sheils, GateHouse argues this was irrelevant and that there is no evidence that GateHouse Media controlled or had any involvement in the day-to-day activities of GateHouse Suburban employees, that GateHouse Media controlled rates of pay for GateHouse Suburban employees, or that GateHouse Media maintained the personnel files of GateHouse Suburban employees. The jury, however, was presented with sufficient

evidence to find that GateHouse Suburban and GateHouse Media shared control over Sheils's working conditions. GateHouse Media decided that GateHouse Suburban would do outsourcing, which led to the elimination of Sheils's job, and GateHouse Media declined to award Sheils one of the new positions for which she applied following her termination. Sheils was subject to GateHouse Media's handbook and code of conduct, and Sheils was covered by GateHouse Media's benefits, human resources, payroll processing, FMLA leave processing, and severance policy. In addition, GateHouse Media did not contest that it was Sheils's employer in the workers' compensation claim. These factors were sufficient for the jury to find that GateHouse Media exercised significant control over the terms and conditions of Sheils's employment and therefore that it was a joint employer.

## II.  Judgment and Relief

Sheils moves the Court to enter judgment awarding Sheils the back pay, emotional distress damages, and punitive damages as determined by the jury. Sheils also seeks prejudgment interest, liquidated damages under the FMLA and FLSA, a statutory penalty for unpaid wages under the Illinois Minimum Wage Law, an award for the adverse tax consequences on her back pay, and attorney's fees and costs. Since the defendants' motion for a new trial has been granted in part, an entry of final judgment will not be entered. But most of the issues raised in plaintiff's motion are suitable for resolution, and are addressed below.

### A.    Retaliatory Discharge (FMLA and Illinois Law)

#### 1.    Back Pay

As previously addressed, the Court denies GateHouse's motion for judgment as a matter of law and for a new trial on the back pay award for the FMLA retaliation-discharge and Illinois law retaliatory discharge claims. Accordingly, at the appropriate time, the court will enter judgment for $62,036.01 in back pay for Sheils's retaliatory discharge.

#### 2.    Prejudgment Interest

Prejudgment interest on back pay is appropriate under the FMLA. 29 U.S.C. § 2617(a)(1)(A)(ii); *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009) (prejudgment interest is "the norm in FMLA cases") (citing 29 U.S.C. § 2617(a)(1)(A)). The FMLA does not provide a statutory rate of prejudgment interest, and in such circumstances, "the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question." *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (quoting *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 31 F.3d 581, 587 (7th Cir. 1994)); *First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999). Sheils was terminated on February 17, 2011; since that date, the prime rate has remained at 3.25%.[4] Compound prejudgment interest "is the norm in federal litigation." *Am. Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937–38 (7th Cir. 2003) (quoting *West Virginia v. United States,* 479 U.S. 305, 310 (1987)).

---

[4] *See* http://www.federalreserve.gov/releases/h15/default.htm (last checked Oct. 27, 2015).

Sheils will be awarded prejudgment interest on her $62,036.01 in back pay from February 17, 2011 to the date judgment is entered, compounded monthly.

Sheils will also receive postjudgment interest on her overall award under 28 U.S.C. § 1961.

### 3.  Liquidated Damages

Sheils seeks liquidated damages under the FMLA, arguing that liquidated damages are mandated unless there is a finding of good faith and that defendant cannot show good faith because the jury found that GateHouse acted willfully in violating the FMLA and the FLSA,. GateHouse argues that liquidated damages are discretionary and that the evidence showed that it acted in good faith.

Under the FMLA, liquidated damages are presumed unless the employer demonstrates that it acted reasonably and in good faith. 29 U.S.C. § 2617(a)(1)(A)(iii); *Holder v. Illinois Dep't of Corr.*, 751 F.3d 486, 498 (7th Cir. 2014). The FMLA provides for liquidated damages equal to the amount awarded for compensatory damages and prejudgment interest. 29 U.S.C. § 2617(a)(1)(A)(iii); *Byrne v. Avon Prods., Inc.*, 125 Fed. App'x 704, 705 (7th Cir. 2004) (awarding liquidated (doubled) damages under the FMLA).

GateHouse has not met its burden of establishing that it acted reasonably or in good faith in discharging Sheils in retaliation for exercising her rights under the FMLA and the Illinois Workers' Compensation Act. Evidence was presented at trial showing that GateHouse knew that it would violate the FMLA to use FMLA leave as a negative factor in making an employment decision, but that Sheils's FMLA leave (and its effect on Sheils's attendance) was taken into account when

26

GateHouse decided to terminate Sheils. GateHouse's evidence of its legitimate business motives does not overcome this specific instance of intentional use of FMLA leave to take an adverse employment action. Because GateHouse has not established that it acted reasonably and in good faith, the imposition of liquidated damages is mandatory under the FMLA. The back pay award of $62,036.01 plus prejudgment interest will be doubled.

### 4. Reinstatement

Sheils also moves for reinstatement to the position of Senior Production Coordinator at Shaw or, in the alternative, front pay for three years. Sheils argues that her request for reinstatement or three years front pay is reasonable in light of her qualifications, long-term history of employment with GateHouse, commitment to continued employment, and established earnings. Defendants argue that reinstatement to a position at Shaw would be inequitable to Shaw—who did not discharge Sheils—and that it is not feasible considering that the position with Shaw is located in Crystal Lake, Illinois, approximately 60 miles from Sheils's home. Defendants also argue that Sheils is not entitled to reinstatement or front pay because she was unable to perform her job at the return of her FMLA leave, because her former position at GateHouse was outsourced to India, and because she has never performed the job of Senior Production Coordinator. Defendants also point to discord between Sheils and some of the former GateHouse employees now working at Shaw.

The FMLA permits appropriate equitable relief, including reinstatement. 29 U.S.C. § 2617(a)(1)(B). "Although reinstatement is the preferred remedy, it is not

always appropriate." *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994) (citing *McNeil v. Econ. Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986). "The court has discretion to grant or deny reinstatement and it may consider a number of factors in exercising that discretion, including hostility in the employment relationship and the lack of an available position to which to reinstate the plaintiff." *Id.* (citing *McNeil*, 800 F.2d at 118). "The effect of equitable remedies on third parties, not to mention on the courts that must take the time to supervise them, is the practical reason why there is no 'right' to an equitable remedy, why the plaintiff's claim to such a remedy may have to yield to competing considerations." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231–32 (7th Cir. 1995) (citing *Hoover v. Wagner*, 47 F.3d 845, 850 (7th Cir. 1995)). Considering these factors, reinstatement to the position of Senior Production Coordinator is not appropriate in this case.

There were two positions to which Sheils applied in 2011, and Sheils has not explained why the Court should choose reinstatement for the Senior Production Coordinator position (which pays approximately $5,000 more per year than Sheils currently makes), when Sheils also had applied to the Ad Traffic Coordinator position (which makes less than Sheils's current job). Instead, Sheils proposes reinstatement or front pay for only the Senior Production Coordinator position, without explanation. Sheils obtained gainful employment in 2012 as a graphic artist, and her current pay is greater than the Ad Traffic Coordinator pay. Although Sheils said that she considers her current position less desirable than that of the

Senior Production Coordinator, the fact that she has for the past three years been gainfully employed in her field of work at a pay greater than one of the positions she sought at GateHouse weighs in favor of finding that reinstatement is not appropriate in this case. *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

Importantly, Sheils has also offered no evidence that a Senior Production Coordinator position (or an Ad Traffic Coordinator position) is currently available at Shaw or that an innocent employee would not be harmed by Sheils's reinstatement. *See Avitia,* 49 F.3d at 1231 (reinstatement would have required employer to "bump" an innocent employee because there were no vacancies). Reinstatement is not appropriate.

### 5.    Front Pay

In the alternative to reinstatement, Sheils requests three years of front pay of the difference between her current earnings and those of a Senior Production Coordinator as of 2014. "[W]hen reinstatement is infeasible, the plaintiff is free to seek in lieu of that remedy an award of 'front pay,' designed to put him in the identical financial position that he would have occupied had he been reinstated." *Avitia*, 49 F.3d at 1231 (citing *McNeil*, 800 F.2d at 118). "Front pay is the difference (after proper discounting to present value) between what the plaintiff would have earned in the future had he been reinstated at the time of trial and what he would have earned in the future in his next best employment." *Avitia*, 49 F.3d at 1231. "[W]hen a party fails to provide the district court with the essential data necessary to calculate a reasonably certain front pay award, the court may deny the front pay

request." *McKnight*, 973 F.2d at 1372. "Such information includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." *Id.* "Moreover, front pay awards, while often speculative, cannot be unduly so. The longer a proposed front pay period, the more speculative the damages become." *Id.* (citing *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir. 1990)).

Again, Sheils does not explain why front pay for the Senior Production Coordinator position would be appropriate when the Ad Traffic Coordinator position—to which she had also applied—pays less than Sheils's current job. Sheils's current gainful employment, at a greater pay rate to one of the positions she formerly sought, makes an award of front pay inappropriate. *See, e.g., McKnight*, 973 F.2d at 1372.

And, although there is "no rule against awarding both double [liquidated] damages and front pay in the same case," the Seventh Circuit has cautioned trial judges to "be careful to make sure that the award of both sorts of relief does not result in overcompensation." *Avitia*, 49 F.3d at 1232. "A substantial liquidated damages award only makes front pay less appropriate if a front pay award would be highly speculative due to the lengthy period for which damages are sought and the lack of certainty that plaintiff would have remained employed during such a lengthy period." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1205 (7th Cir. 1989). Given the generous liquidated damages that Sheils has been awarded, she would be overcompensated with an award of both front pay and liquidated damages,

especially when she is currently employed at a similar pay rate in a comparable field. Given the uncertainty over the nature of viable positions at Shaw, and the uncertainty over what Sheils's performance in the GateHouse-Shaw environment would have been like for three years, it would be too speculative to fix any amount of front pay.

Sheils's front pay request is also denied because she failed to provide the appropriate discount rate. Front pay is defined as "the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998) (quoting *Downes*, 41 F.3d at 1141 n. 8). Without sufficient information to calculate front pay, it should be denied. *See, e.g.,* *McKnight*, 973 F.2d at 1372; *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 863 (7th Cir. 2001). For these reasons, Sheils's request for front pay is denied.

### 6. Award for Adverse Tax Consequences

Sheils also seeks an award to offset the tax burden that she will incur as a result of her lump-sum back pay award. The Seventh Circuit, joining other circuits, recently adopted the availability of such an offset in discrimination cases. *E.E.O.C. v. Northern Star Hosp., Inc.*, 777 F.3d 898, 904 (7th Cir. 2015). Sheils has been awarded $62,036.01 in back pay for her retaliatory discharge. By receiving the wages now, in a lump sum added to her existing income, Sheils will be bumped into a higher tax bracket than if she had received the same amount of unpaid wages spread out from her termination in 2011, and she would undoubtedly have paid less

31

in taxes than she will have to now. Although disputing the amount of the underlying back pay award, GateHouse did not dispute an award to offset Sheils's tax burden. Sheils maintains that the back pay award would place her in the 25% tax bracket, as opposed to the 15% tax bracket under her current salary,[5] and she requests a 10% tax-component award on the back pay and front pay to account for the difference. [111] at 15–16. Sheils will be awarded $6,203.60 (10% x $62,036.01) to offset Sheils's back pay award.

## B. Overtime (FLSA and Illinois Minimum Wage Law)

The jury found that Sheils worked 37.5 hours of unpaid overtime. Sheils's hourly rate was $20, meaning her overtime hourly rate was $30. Her total unpaid overtime is $1,125 ($30 x 37.5). At the appropriate time, the court will enter judgment for $1,125 in unpaid wages for Sheils.

### 1. Liquidated Damages and Illinois Minimum Wage Statutory Penalty

Sheils also seeks liquidated damages under the FLSA. Liquidated damages are presumed under the FLSA unless the employer establishes that they acted reasonably and in good faith. 29 U.S.C. §§ 216(b), 260; *Jackson v. Go-Tane Servs., Inc.*, 56 Fed. App'x 267, 273 (7th Cir. 2003). The employer bears the burden of proving both good faith and reasonable belief to prevent the imposition of "mandatory" liquidated damages. *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 733 (7th Cir. 1998). The FLSA provides for liquidated damages in an equal amount to the unpaid wages. 29 U.S.C. § 216(b); *Shea*, 152 F.3d at 733 (There is a

---

[5] See Internal Revenue Service, Revenue Procedure 2014-61, available at http://www.irs.gov/pub/irs-drop/rp-14-61.pdf (last checked Oct. 27, 2015).

"strong presumption under the statute in favor of doubling," which is "the norm, not the exception.").[6]

GateHouse has not carried its burden that it acted reasonably and in good faith in violating the FLSA through its failure to pay Sheils's overtime. Evidence was presented at trial to show that Sheils's direct supervisor, Gilbert, made Sheils change her times or changed them herself and knew that Sheils had worked overtime without payment.[7] Sheils is entitled, therefore, to liquidated damages.

Sheils also seeks a statutory penalty under the Illinois Minimum Wage Law, which provides for a statutory penalty in the form of a 2% monthly charge on wages left unpaid. 820 ILCS 105/12(a) (providing for "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid"). After prevailing on her overtime claim, Sheils is entitled to the 2% penalty provided for the in the statute.[8]

---

[6] Prejudgment interest is not awarded with liquidated damages for an FLSA violation. *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 406 (7th Cir. 1999). The FMLA specifically provides for both prejudgment interest and liquidated damages. 29 U.S.C. § 2617(a)(1)(A)(iii).

[7] The Seventh Circuit has not directly addressed whether a jury's finding of willfulness precludes a court from finding "good faith" that bars liquidated damages, but other circuits have held that a jury's finding of willfulness precludes a finding of good faith. *See Jackson v. City of Hot Springs*, 751 F.3d 855, 867 (8th Cir. 2014); *Black v. SettlePou, P.C.*, 732 F.3d 492, 501 (5th Cir. 2013); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1166–67 (11th Cir. 2008); *see also Byrne*, 125 Fed. App'x at 705 (liquidated damages "follow automatically" if special verdict that employer had not acted in good faith was "supported by the evidence"). Ordinarily, a jury verdict "binds the judge with respect to any factual issues common to the jury- and judge-tried claims." *McKnight v. General Motors Corp.*, 908 F.2d 104, 113 (7th Cir. 1990). Whether or not the jury verdict precludes a good-faith finding, I conclude that GateHouse has not carried its burden.

[8] GateHouse raised the question of whether this 2% penalty is duplicative and improper with an award of liquidated damages under the FLSA, but did not offer case law or argument on this point. Where two statutory regimes provide for separate causes of action,

## C.     Attorneys' Fees and Costs

Sheils seeks attorneys' fees and costs for prevailing on her FMLA, FLSA, and Illinois Minimum Wage Law claims. *See* 29 U.S.C. § 2617(a)(3); 29 U.S.C. § 216(b); 820 ILCS 105/12(a). GateHouse concedes that Sheils's attorneys may petition the Court for such an award under these statutes if her claims are upheld in the Court's post-trial rulings. [121] at 3. Accordingly, Sheils should submit a fee petition no later than 91 days after entry of judgment. *See* Local Rule 54.3(b).

## III.   Successor Liability

Sheils moves for entry of judgment against Shaw Suburban Media Group, Inc., under a theory of successor liability. In October 2012, Shaw purchased GateHouse Suburban from GateHouse Media. Previously, Shaw's motion for summary judgment—claiming it was not an appropriate defendant under the theory of successor liability—was denied. [47]. Before the trial, the parties agreed to submit evidence on successor liability, in writing, if the jury found for Sheils.

In a case involving multiple corporate entities, "successor liability is 'the default rule . . . to enforce federal labor or employment laws.'" *Northern Star*, 777 F.3d at 901 (quoting in part *Teed v. Thomas & Betts Power Sols., LLC,* 711 F.3d 763, 769 (7th Cir. 2013)). Without successor liability, "the victim of the illegal employment practice is helpless to protect his rights against an employer's change

contain clear remedies, and are not mutually exclusive, they can and should both be given effect. Even if the purposes of the remedies are shared, there is no reason to conclude that the FLSA's liquidated damages provision preempts Illinois's decision to impose a 2% penalty. In the absence of a compelling argument from GateHouse for not awarding the 2% penalty provided by statute, the Wage Law statutory penalty will be permitted in addition to FLSA liquidated damages.

in the business" because "the predecessor's illegal act may have left the employee without a job, promotion, or other employment benefits that he cannot now obtain from another employer, but that he might have received from the successor had the predecessor not violated the employee's rights." *Northern Star*, 777 F.3d at 901–02 (quoting in part *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 746 (7th Cir. 1985). There is a five-factor test for successor liability in the federal employment-law context: (1) whether the successor had notice of the pending lawsuit; (2) whether the predecessor could have provided the relief sought *before* the sale or dissolution; (3) whether the predecessor could have provided relief *after* the sale or dissolution; (4) whether the successor can provide the relief sought; and (5) whether there is continuity between the operations and work force of the predecessor and successor. *Northern Star*, 777 F.3d at 902 (citing *Teed,* 711 F.3d at 765–66). "Where the successor has notice of a predecessor's liability, there is a presumption in favor of finding successor liability." *Id*.

In Shaw's prior briefing on its motion for summary judgment regarding successor liability, Shaw did not dispute that the successorship elements as set forth in *Teed v. Thomas & Betts Power Solutions, LLC*, 711 F.3d 763 (7th Cir. 2013), are met under the circumstances in this case. This was a reasonable concession because the factors all weigh in favor of finding successor liability.

First, Shaw had notice. As evidenced by GateHouse's answer to Sheils's Amended Complaint and the Asset Purchase Agreement, Sheils's lawsuit was communicated to Shaw prior to its acquisition of GateHouse Suburban. [32] ¶ 15;

[108-1] at ¶ 4.15 & Schedule 4.15; [108-4] at 41; [38-4]; [47] at 3–4. This factor creates "a presumption in favor of finding successor liability." *Northern Star*, 777 F.3d at 902.

Second, defendants have not denied that, prior to Shaw's purchase, GateHouse Suburban would have been able to satisfy a judgment. And because Shaw purchased all of GateHouse Suburban's assets and the proceeds of the sale were retained by GateHouse Media ([108-2] ¶¶ 3–5), the third factor—whether GateHouse Suburban could have provided relief after the sale—weighs in favor of successor liability. After Shaw's purchase, GateHouse Suburban could not have paid any judgment obtained against it. [47] at 4; [38] at 4. *Northern Star*, 777 F.3d at 902.

Shaw could provide the relief sought by Sheils, which is a monetary award and reinstatement to the Senior Coordinator Position, which went to Shaw (although I have found reinstatement inappropriate in this case). Defendants do not dispute this. Also, Shaw substantially continued the prior business operations of GateHouse Suburban, and retained the majority of GateHouse Suburban's employees. [47] at 4; [38] at 4; [108-4] at 19–20; [108-7]. There is continuity between the operations and work force of the GateHouse Suburban and Shaw. *See Northern Star*, 777 F.3d at 902.

Despite this presumption of successorship liability, Shaw argues that it would be unnecessary and inequitable to find successor liability under the circumstances of this case because an award of reinstatement or front-pay would be

inequitable, GateHouse Media would be able to satisfy any monetary judgment, and Shaw was an innocent party. I disagree.

First, successor liability may be imposed even when an employee does not seek reinstatement, *G-K-G, Inc.*, 39 F.3d at 748. Second, even though Shaw was an innocent party, successor liability does not require discriminatory intent—rather, it "is imposed on the successor for the acts, intentional or otherwise, of a predecessor solely because the policies of the laws at issue are substantially promoted." *Musikiwamba*, 760 F.2d at 747. Although it would be inequitable to impose successor liability upon an innocent purchaser who did not have notice, *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 849 (7th Cir. 2015), when a successor has notice, the remedy for successor liability is the "opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price." *Id.* (quoting *Musikiwamba*, 760 F.2d at 750). Prior to its acquisition of GateHouse Suburban, Shaw had notice of Sheils's lawsuit and therefore had the opportunity to consider the effect of a judgment in Sheils's favor and negotiate accordingly.

Finally, while not dispositive, "a creditor's ability to recover against the predecessor is a factor of significant weight in deciding whether to allow successor liability." *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995). GateHouse Suburban is no longer in business, but GateHouse Media is a viable company able to satisfy the judgment. This cuts in favor of Shaw, but on balance, its notice of Sheils's claim before its acquisition of GateHouse Suburban's assets and the

continuity of operations between Shaw and GateHouse Suburban persuade me that successor liability is warranted here.

At the appropriate time, judgment will be entered against Shaw based on successor liability.

## IV. Conclusion

Defendants' motions for judgment as a matter of law, for a new trial, and for remittitur [97, 114] are granted in part, denied in part. A new trial is ordered on plaintiff's FMLA-interference and FMLA-retaliation claims based on her demotion. Sheils's motion for entry of judgment and full relief [111] is granted in part. Reinstatement and front pay will not be awarded, but the other aspects of relief requested will be entered. Sheils's motion for entry of judgment against Shaw under successor liability [108] is granted. The entry of final judgment is deferred until the remaining claims are resolved.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 10/27/15